UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

YVONNE S.[1],                          )
                                       )
          Plaintiff,                   )
                                       )
     v.                                )     CIVIL NO.  3:19cv110
                                       )
NANCY A. BERRYHILL, Acting             )
Commissioner of Social Security,       )
                                       )
          Defendant.                   )

<u>OPINION AND ORDER</u>

This matter is before the court for judicial review of a final decision of the defendant

Commissioner of Social Security Administration denying Plaintiff's application for Supplemental

Security Income (SSI), as provided for in the Social Security Act.  Section 205(g) of the Act

provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the

transcript of the record including the evidence upon which the findings and decision complained

of are based.  The court shall have the power to enter, upon the pleadings and transcript of the

record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with

or without remanding the case for a rehearing."  It also provides, "[t]he findings of the

[Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  42

U.S.C. §405(g).

     The law provides that an applicant for SSI must establish an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to last for a continuous period of no less than 12 months. . . ."

42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental impairment is "an

_____

[1] For privacy purposes, Plaintiff's full name will not be used in this Order.

impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1.  The claimant has not engaged in substantial gainful activity since February 13, 2015, the application date (20 CFR 416.971 *et seq.*)

2.      The claimant has the following severe impairments: degenerative disc disease of the lumbar and cervical spine, and obesity (20 CFR 416.920(c)).

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she can never climb ladders, ropes or scaffolds.  She can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. She can have occasional exposure to unprotected heights, dangerous heavy moving machinery and wet slippery surfaces.

5.      The claimant has no past relevant work (20 CFR 416.965).

6.      The claimant was born on January 8, 1965 and was 50 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed (20 CFR 416.963).

7.      The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since February 13, 2015, the date the application was filed (20 CFR 416.920(g)).

(Tr. 12- 19 ).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability insurance benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review.  This appeal followed.

Plaintiff  filed her opening brief on June 27, 2019.  On July 17, 2019, the defendant filed

a memorandum in support of the Commissioner's decision to which Plaintiff replied on August 12, 2019. Upon full review of the record in this cause, this court is of the view that the ALJ's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). From the nature of the ALJ's decision to deny benefits, it is clear that Step 5 was the determinative inquiry.

Plaintiff began having musculoskeletal problems following a motor vehicle accident in March 2009. (Tr. 329.) At that time, Plaintiff complained of both neck and low back pain. She began treating with Dr. Peter Carney, a neurosurgeon who has since retired. MRI imaging showed "degenerate disc disease changes C5-C6 of a moderate nature. Moderate facet arthopathy." (Tr. 356.) In August 2009, Plaintiff underwent a sensory nerve conduction test of the cervical spine which revealed "very severe impairment of her C5 nerve root on the left, very

severe impairment of her S1 nerve root on the right." (Tr. 356. *See also* Tr. 387.)

Plaintiff underwent sensory conduction tests of the lumbar spine in May 2010 which revealed impaired nerve conduction of the left L1, L2, L3 and right L4, S1. (Tr. 383.) MRI imaging of the lower back in May 2010 showed minimal degenerative disc disease with no canal stenosis or neural foraminal narrowing. (Tr. 378.) Dr. Carney tracked Plaintiff's limitations using the Oswestry disability index. Her indexes ranged from 62 to 76. (Tr. 346, 352, 359). Dr. Carney treated her with several transforaminal epidural steroid injections, (Tr. 358) Vicodin, a narcotic, and Flexeril, a muscle relaxant. (*See, e.g.*, Tr. 361.) Dr. Carney endorsed a 10-pound weight lifting limit for Plaintiff on March 25, 2010. (Tr. 360.)

Plaintiff transitioned care from Dr. Carney to Dr. Kevin Drew in September 2010. On physical exam, Dr. Drew noted a limited range of motion of both the lumbar spine and the cervical spine. (Tr. 410.) On November 4, 2010 Dr. Drew performed a provocative lumbar discography. The discography showed "internal disc disruption at L3-4 with partial concordant pain in the low back and medial right leg radiating down to the right anterior knee." (Tr. 405.) Dr. Drew charted recommendations for treatment, including a single level fusion, medication management, spinal cord stimulation or aggressive physical treatments. (Tr. 406.)

Dr. Drew also ordered a new MRI of Plaintiff's cervical spine and a CT of her lower back. The MRI of the cervical spine showed "mild cervical spondylosis and small central disc protrusion C5-6 which mildly narrows the spinal canal and left neural foramen." (Tr. 414.) The MRI also showed a congenital fusion of C2-3 and mild facet arthrosis at C3-4. (Tr. 414.) The lumbar spine CT impression showed a "[r]ight posterolateral annular tear extending for greater than 30 degrees spread around the circumference of the annulus. This represents a grade 4 tear

by the Modified Dallas Discogram description. There is mild diffuse disk bulging as well." (Tr. 413.) Dr. Drew performed a series of epidural steroid injections in Plaintiff's cervical spine. (*See* Tr. 403, 404.) Plaintiff informed Dr. Drew that she had experienced some relief, but only for a short period of time. (Tr. 401, 403.)

By May 2011, Dr. Drew noted that Plaintiff had subjective complaints of "numbness and tingling in her left hand involving the fourth and fifth digits with dropping a lot of things as well as dropping things from the right hand." (Tr. 401.) Dr. Drew performed an upper extremity EMG which revealed a left ulnar neuropathy most localizable to the medial epicondyle as well as chronic non-active right C6-7 cervical radiculopathy. (Tr. 400.) Dr. Drew referred Plaintiff to South Bend Orthopedics for a left ulnar transposition surgery. (Tr. 400.)

Throughout his charting, Dr. Drew noted Plaintiff had a limited range of motion in the lumbar spine. (Tr. 456, 458, 460, 462, 464.) Dr. Drew consistently prescribed Norco, a narcotic, Gabapentin (for nerve pain), Zanaflex (a muscle relaxant), and Cymbalta (for depression). (*Id.*) Shortly before Plaintiff applied for disability benefits on February 19, 2015, Dr. Drew performed a second provocative lumbar discography. This showed, "internal disc disruption of the L3-L4 disc with partial concordant pain the low back and medial right leg radiating down to the right anterior knee." (Tr. 580.)

At Social Security's request, Plaintiff underwent two consultative exams by Dr. Ralph Inabnit. In the March 31, 2015 exam, Dr. Inabnit noted normal range of motion in the cervical and lumbar spine, (Tr. 482) as well as normal (5/5) strength in the upper and lower extremities. (Tr. 483.) His conclusion included, "She cannot stand or sit for prolonged periods of time." (Tr. 483.)

Plaintiff saw Dr. Inabnit again on August 4, 2015. She reported worsening back pain. (Tr. 491.) On this exam Plaintiff showed decreased range of motion of the lumbar spine in forward flexion, extension, lateral flexion and rotation. (Tr. 494, 496.) In his conclusions, Dr. Inabnit said he would "refer to Orthopedics or neurosurgeon regarding her musculoskeletal complaints, which have been longstanding and certainly needs further workup and evaluation." (Tr. 497.)

A follow up MRI on September 11, 2015, confirmed the presence of annular tears: "At L4-5 level…There is a possible annular tear of the disc posteriorly on the right. …"At L3-4 there is a mild annular tear and mild disc bulging posteriorly on the right which slightly encroaches upon the right neural foramen." (Tr. 572.) An annular tear is a well- recognized competent producer of pain.

In January 2017 Plaintiff transitioned her pain care from Dr. Drew to Dr. Stephen Ribaudo for neck and low back pain, neuropathic pain, and peripheral neuropathy. (Tr. 728.) Plaintiff saw Dr. Ribaudo monthly. (Tr. 708, 712, 715, 718, 722, 726.) Dr. Ribaudo prescribed the potent narcotic Dilaudid 4mg every four hours, up to a maximum of five tablets a day, gabapentin 600mg, tizanidine 4mg, and Ambien 10mg. (*Id.*)

At her sixth appointment, on June 13, 2017, Dr. Ribaudo, a physical medicine rehabilitation physician, completed a "Physician's Opinion of Patient's Physical Limitations" form. (Tr. 705.) Dr. Ribaudo outlined multiple opinions. Dr. Ribaudo opined that in terms of an eight hour work day, Plaintiff would be able to cumulatively sit for a total of three hours, stand for one and walk for one. (Tr. 705.) Dr. Ribaudo opined Plaintiff was restricted to an eight pound lifting limit.(*Id.*) Dr. Ribaudo felt Plaintiff would never be able to carry any weight due to lumbar

spondylosis and peripheral neuropathy. (*Id*.) Dr. Ribaudo also opined that Plaintiff could rarely reach, handle or engage in fine manipulation. (Tr. 705-706.) Dr. Ribaudo opined Plaintiff would not be able to sit or stand for an extended period of time (*i.e.* 20 minutes) without the need to change positions. (Tr. 706.) Dr. Ribaudo further opined that Plaintiff's impairments would cause Plaintiff to miss more than two days of work per month. (Tr. 707.)

At the hearing, Plaintiff testified that she relies on her family to assist her with cooking, cleaning her home, and laundry. (Tr. 75-76.) Plaintiff testified that she does not drive. She can lift six to eight pounds. (Tr. 77.) She testified that she uses a cane that Dr. Drew wanted her to have primarily for balance issues. (Tr. 83-84.) She testified that in order to stand she would need to lean on the cane or onto something very sturdy. (Tr. 84.) While standing, Plaintiff noted she would need to lean on something because she "does not trust what [her] back or [her] legs will do." (Tr. 85.) She testified that in the six months prior to the hearing she had fallen twice a month (Tr. 86.)

Plaintiff also testified that the medications she takes make her feel "like a walking drugstore" (Tr. 73), explaining they make her drowsy and that she sleeps a lot. (Tr. 74.) She described her life as "like a fog." (Tr. 74.) Between the hours of 9:00 AM and 5:00 PM she testified she would nap three to four hours. (Tr. 89.) Plaintiff testified Dr. Ribaudo prescribed Ambien because she would not otherwise be able to get to sleep at night due to her pain issues. (Tr. 89.)

When asked to relate what she does in in typical day she replied, "Usually it's not a whole lot other than television. My daughter-in-law cooks for me, makes preplanned meals. Or, some days I don't get out of bed at all . . . sometimes two or three days on end." (Tr. 75.) She

could not remember the last time she cleaned her house. (Tr. 75.)

Plaintiff asserted that she could walk about 200 feet and could only stand between five and eight minutes at one time. (Tr. 76.) She estimated that in an eight hour day she could stand a cumulative total of one hour. (Tr. 79.) When asked whether she could commit to sitting upright the other seven hours in a workday, she replied, "Oh, absolutely not." (Tr. 79.) Plaintiff also testified the most she was able to lift and carry was about six to eight pounds. (Tr. 76.)

Plaintiff's son's fiancée, T.W., also testified. T.W. said she saw Plaintiff three or four days per week and spent about 15 to 20 hours a week with Plaintiff. (Tr. 92.) T.W. testified Plaintiff could not manage her activities of daily living without her assistance. T.W. related based on her observations that Plaintiff's pain, "is just incredible, …she's so lethargic all the time. She's uncomfortable." (Tr. 93.)

When T.W. was asked to explain why she felt the pain was incredible she answered, "She's up, she sits down. She'll stand up, she'll sit down, she'll lay down, she'll get back up." (Tr. 93.) T.W. testified that 10 minutes was a long time for Plaintiff to maintain either a seated or standing position. (Tr. 94.) T.W. also testified that in an eight hour period she estimated that Plaintiff would lie down about six hours. (Tr. 95.)

The ALJ asked the vocational expert a single hypothetical question, to assume a person of the Plaintiff's age, education, and with no past relevant work experience who was able to perform work at the light exertional level except she can never climb ladders, ropes or scaffolds. She can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. She can have occasional exposure to unprotected heights, dangerous heavy moving machinery and wet slippery surfaces. (Tr. 98.) The vocational expert responded with three occupations Plaintiff

could perform with approximately 680,000 light jobs in the national economy. (Tr. 98.)

On cross-examination the vocational expert testified that for someone who could reach no more than occasionally, as opined by Dr. Ribaudo, there would be no work. (Tr. 99.) The vocational expert also testified that someone who could only lift up to 10 pounds, consistent with the opinions offered by both Dr. Ribaudo, and Dr. Carney, could only do sedentary work. (Tr. 102.) Similarly, the vocational expert testified that for someone who would need an option to change positions from sitting to standing and vice versa, as opined by Dr. Ribaudo and by consultative examiner Inabnit, (*See* Tr. 483) it would eliminate the sales attendant and the cashier job she had outlined. (Tr. 103.)

In support of remand, Plaintiff first argues that the ALJ improperly cherry-picked and mischaracterized evidence to support her determination while ignoring evidence that supports Plaintiff's claim. "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding. *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir.2009).

Plaintiff herein argues that throughout the decision the ALJ ignored examinations that pointed to decreased range of motion, positive straight test raises, and MRI findings showing degenerative changes, choosing instead to cherry-pick evidence from the record that supported her decision to deny Plaintiff benefits.

An ALJ may not substitute their own opinion and play doctor. *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007). Plaintiff claims that the ALJ repeatedly points to findings of normal range of motion at the spine (*See* Tr. 16, 18, 19, 20, 21, 22) while ignoring repeated incidences in the record showing abnormal results. In the opinion, the ALJ notes, "physical examinations

overwhelmingly show normal range of motion at the lumbar and cervical spine, normal strength, normal sensation, negative straight leg raise, and normal gait without the use of any assistive device." The ALJ cited Exhibits 6F; 15F/21-22, 42; 18F-1-2 to support her view of the "overwhelming evidence." Exhibit 6F was a March 31, 2015 consultative examination with Dr. Inabnit. Exhibit 15F contains emergency department records from when Plaintiff had cholelithiasis, a gallbladder attack (Tr. 641-642). It is dubious that while in the ER her lumbar and cervical range of motion was tested. Plaintiff notes that with electronic medical records the physician must affirmatively note the acute problems, otherwise the default will be normal findings.

The records at 18F/1-2 that the ALJ cites is an assessment of Plaintiff's complaint of "severe left leg pain (inguinal) and down the leg to the foot." (Tr. 708) The only range of motion finding in this charting found that her "hip range of motion is good and does not increase pain. Straight leg raise test is negative." (Tr. 709.) The doctor was examining an acute issue for which hip range of motion testing was needed. There is no indication the doctor evaluated her spinal range of motion.

Plaintiff argues that these record references do not support the ALJ's assertion that, "physical examinations overwhelmingly show normal range of motion at the lumbar and cervical spine", but that the evidence of record not cited by the ALJ showed Plaintiff repeatedly had decreased range of motion of the lumbar spine. Physical exams from 2009 and 2010 with Dr. Carney showed decreased range of motion (Tr. 351, 353, 355, 357, 360). Throughout his charting, Dr. Drew noted Plaintiff had a limited range of motion in the lumbar spine. (Tr. 456, 458, 460, 462, 464.)

Plaintiff further argues that the ALJ ignored the fact that in the August 4, 2015 consultative exam by Dr. Inabnit, he found restricted range of motion in the lumbar spine. (Tr. 494.) Plaintiff takes issue with the ALJ's finding that the medical imaging showed only "mild changes." (Tr. 21.) Plaintiff points out that the objective evidence actually revealed more progressed changes. Spine MRIs performed in 2015 showed "moderate posterior disc osteophytosis. . . mild right and moderate left foraminal stenosis. This disc osteophyte complex is larger in size as compared to prior examination" at the C5-6 level. (Tr. 620.) At C6-7 Plaintiff had "moderate disc bulging with extension into the left neural foramen." (Tr. 621). The objective MRI evidence revealed "central canal stenosis" at C5-6 and the C6-7 level of the cervical spine. (Tr. 570-571.) In the lower back, a provocative lumbar discography showed, "internal disc disruption of the L3-L4 disc with partial concordant pain the low back and medial right leg radiating down to the right anterior knee." (Tr. 580.) "internal disc disruption of the L3-L4 disc with partial concordant pain the low back and medial right leg radiating down to the right anterior knee." (Tr. 580.) A follow up MRI on September 11, 2015, confirmed the presence of annular tears: "At L4-5 level…There is a possible annular tear of the disc posteriorly on the right. …"At L3-4 there is a mild annular tear and mild disc bulging posteriorly on the right which slightly encroaches upon the right neural foramen." (Tr. 572)

The ALJ also cited Plaintiff's lack of more treatment as a rationale in her decision. In the opinion, the ALJ noted, "The medical record does not show that the claimant's physicians have recommended more invasive treatment options." (Tr. 21.) However, Plaintiff points out that Dr. Drew charted recommendations for treatment, including a single level fusion, medication management, spinal cord stimulation or aggressive physical treatments. (Tr. 406.) And Plaintiff

has undergone a number of invasive procedures. She has had two provocative discograms. (Tr. 405, 572) Dr. Drew gave her a number of transforaminal epidural steroid injections. (*See, e.g.*, Tr. 403, 404.)

Plaintiff contends that the ALJ ignored the fact that Dr. Drew consistently prescribed Norco, a narcotic, Gabapentin (for nerve pain), Zanaflex (a muscle relaxant), Cymbalta (for depression), and Dr. Ribaudo prescribed Dilaudid, a morphine like narcotic, to be taken every four hours. There is an inference in the prescribing of these drugs that the doctors believed Plaintiff's complaints of severe pain.

Moreover, this part of the ALJ's rationalization, that Plaintiff had not had more invasive treatment, is undercut by the hearing testimony, and the ALJ's own decision. Considering the first statement that Plaintiff's physicians did not recommend more invasive treatment options, the decision itself noted Plaintiff "has discussed surgery with her physicians, but surgical options would cause more damage than relief." (Tr. 19.) The ALJ also noted that the Plaintiff declined treatment with a spinal implant "due to apprehensions regarding the safety of the device." (Tr. 19.)

The law is clear:

> The ALJ must evaluate the record fairly. Thus, although the ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling. Otherwise it is impossible for a reviewing court to tell whether the ALJ's decision rests upon substantial evidence.

*Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (citations omitted) (ALJ omitted or mischaracterized discussion and evidence of bowel and bladder dysfunction, limited ability to bend, and propensity to drop things); *see also Wade v. Colvin*, No. 3:14-cv-1422-PPS (N.D. Ind.

March 10, 2015)(ALJ "must confront the evidence that does not support her conclusion and explain why it was rejected.").

The ALJ has a duty to (1) create an accurate and logical bridge, (2) review and consider all the evidence and (3) address the evidence most favorable to the claimant. *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir 2006); *Kastner v. Astrue*, 697 F.3d 642, 647-48 (7th Cir. 2012); *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Plaintiff argues that a proper longitudinal consideration of the evidence shows that Plaintiff's functioning was far from normal.

In response, the Commissioner contends that Plaintiff relied upon evidence from 2009, 2010, and 2014 "before the relevant period" showing decreased range of motion. However, the evidence from these dates are all relevant because Plaintiff alleged her disabilities began in 2010, the only thing that limited her to entitlement to 2015 and after was the fact that she did not have enough substantial work history to gain insured status for benefits under Title II of the Social Security Act, 42 U.S.C §423(c)(1).

Furthermore, Social Security's own regulation states that "we review all of the evidence relevant to your claim." 20 C.F.R. § 416.920(b). The regulation does not say that the evidence is from the date after a person files or a date after they allege disability. To limit evidence, as the Commissioner suggests, would mean that claimants with progressive diseases or long-term medical issues would not have evidence considered. Case law also supports this premise. *Groves v. Apfel* notes that even "evidence from a previous proceeding may be used to support later evidence affirming the condition and disability." *Groves v. Apfel*, 158 F.3d 809, 810 (7th Cir. 1998). Although *Groves* was an issue of res judicata, the logic remains – a totality of the evidence is necessary when evaluating a claimant's disability.

This court agrees with Plaintiff that the ALJ impermissibly cherry-picked favorable evidence over evidence that showed the Plaintiff has a long history of debilitating limitations. The ALJ erred by giving weight to the opinions of the State Agency over the Plaintiff's physicians and Social Security's own consultative examiner. Thus, remand is appropriate.

Next, Plaintiff argues that the ALJ erred by not giving controlling weight to the opinions of her treating physicians. Plaintiff's treating physician, Dr. Stephen Ribaudo, prepared a report outlining areas of limitations that he felt are disabling. As discussed above, Dr. Ribaudo opined Plaintiff suffers from multiple disabling limitations. The ALJ summarily rejected this opinion, assigning it "little weight" noting that the "overall evidence of record, including his own treatment notes, does not support his opinion." (Tr. 21.)

The opinion of a treating source is entitled to controlling weight if it is (1) supported by medically-acceptable clinical and laboratory diagnostic techniques and (2) not inconsistent with other substantial evidence in the record. 20 C.F.R § 416.927; SSR 96-2p; *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). The Seventh Circuit has held that the opinion of a source that has examined the claimant will be given more weight than an opinion of a source that has not examined the claimant, and an ALJ cannot reject the opinion of an examining physician solely because of a contradictory opinion of a non-examining physician. *See Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003); *see also Moore v. Barnhart* , 278 F.3d 920, 924 (9th Cir. 2002).

Agency regulations provide: "[w]hen we do not give the treating source's opinion controlling weight, we apply the factors . . . and will always give good reasons in our notice of determination or decision for the weight we give [the] treating source's opinion." *See* 20 C.F.R. § 416.927(c)(2). The ALJ must provide good reasons for rejecting a treating source's opinion

given: (1) the examining relationship; (2) the treatment relationship, including the (i) length of the treatment relationship and the frequency of examination, and (ii) the nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) any other relevant factors. *See* 20 C.F.R. § 416.927(c)(1)-(6). Failure to comply with this "treating physician rule" constitutes legal error and requires remand to the ALJ. *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) (citing *Martinez v. Astrue*, 630 F.3d 693 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299 (7th Cir. 2010)).

In the present case, while the ALJ does discuss the length of the treating relationship and the frequency of examination, the ALJ fails to discuss Dr. Ribaudo's specialty of physical medicine and rehabilitation. The ALJ's consistency findings are also suspect because the ALJ only pointed to findings that were inconsistent with Dr. Ribaudo's opinions and ignored the weight of the evidence that pointed to his opinion being consistent with the evidence as a whole.

The ALJ found Dr. Ribaudo's opinion being "inconsistent with EMG findings of no peripheral neuropathy and physical examination findings of normal range of motion, gait, strength, grip, and sensation." (Tr. 21.) However, Dr. Ribaudo's assessment is consistent with the objective medical imaging which showed degenerative changes. (*See* Tr. 571, 572). It is also consistent with the repeated physical examinations that showed Plaintiff actually had restricted ranges of motion. (*See* Tr. 351, 353, 355, 357, 360, 494). His assessment is also consistent with the fact that he prescribed high doses of narcotics, including Dilaudid up to five times per day to try to control Plaintiff's severe pain. (Tr. 708.) As discussed above, it appears the ALJ dismissed Dr. Ribaudo's opinion by picking out only the inconsistent evidence and ignoring the consistent evidence that is indicative of Plaintiff's disabling conditions. Overall, Dr. Ribaudo's

opinion finding Plaintiff had disabling limitations is entirely consistent with multiple objective abnormalities in the record.

The ALJ also failed to consider the opinion of Dr. Carney who noted Plaintiff had a 10 pound weight limit for work in March 2010. The ALJ does not discuss this evidence in her opinion, nor does she account for it in her RFC finding. There is no evidence in the record that this restriction was ever lifted, and the evidence as a whole shows that Plaintiff's condition became progressively worse over time, not better.

Instead of giving weight to the doctors who actually treated Plaintiff, the ALJ gave great weight to the opinions of the State Agency consultants. (Tr. 22.) These consultants never met Plaintiff and have never treated Plaintiff. Instead, the State Agency consultants rely on a paper review of Plaintiff's file to make a determination regarding her disability. In giving these consultants' opinions great weight, the ALJ rationalized their findings as consistent with "mild findings on medical imaging and normal findings on physical examination, including normal range of motion at the spine and upper extremities."

Two years passed between the last State Agency assessment and Plaintiff's hearing. (Tr. 63.) Prior to hearing, Plaintiff admitted evidence to the record that was not before the State Agency. The Seventh Circuit has questioned the rationale of ALJs assigning great weight to a State Agency when the State Agency consultants never had the benefit of examining the claimant. The Seventh Circuit has also found cause for remand when the State Agency's opinions are given great weight although the opinions were formed before the totality of the evidence was in the record. *See Thomas v. Colvin*, 826 F.3d 953, 960 (7th Cir. 2016) ("ALJ erred by accepting Dr. Ruiz and Dr. Sands's reviews of the evidence uncritically despite the fact that they never

examined Thomas and did not have the benefit of much of the 2011 treatment records when the created their opinions."); *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016) ("Before basing a denial on such a finding, the ALJ should have considered contrary evidence and obtained a medical opinion based on a complete record."); *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (remanding where ALJ uncritically accepted vague non-examining physician's report and failed to submit new MRI to medical scrutiny, even though "it was new and potentially decisive medical evidence").

The ALJ cannot reject the opinions of Dr. Ribaudo or Dr. Carney in favor of the non-examining paper reviewers from the State Agency without supporting evidence. *Gudgel v. Barnhart*, 345 F.3d at 470. Nor can the ALJ reject their opinions without articulating "good reasons" following the weighing analysis set forth in the Regulations. 20 C.F.R. § 416.927.

In response, the Commissioner asserts that "a statement by a medical source that an individual is disabled is not a medical opinion, but is instead an issue reserved to the Commissioner." However, Dr. Ribaudo did not make a blanket statement that the Plaintiff is disabled. Rather, Dr. Ribaudo outlined very specific areas of limitations that should have been considered in the ALJ's RFC findings.

In Dr. Ribaudo's medical opinion, the Plaintiff can stand one hour total out of an eight hour day, can walk one hour out of an eight hour day, can lift eight pounds, would need to change positions frequently (*i.e.* every 20 minutes), would need to lie down periodically throughout the day due to pain/fatigue, and she would likely miss more than two days of work per month. (*See* Tr. 705-707). Dr. Ribaudo's findings were based upon the Plaintiff's long history of cervical spondylosis, cervicalgia, lumbar spondylosis with sciatica, peripheral

neuropathy, and neuropathic pain. (*Id*.).

Dr. Ribaudo's assessment is a medical opinion of the Plaintiff's limitations that the ALJ failed to consider. The limitations outlined by Dr. Ribaudo suggest the Plaintiff retained the capacity for a sedentary RFC, but certainly not a light RFC. Dr. Ribaudo's opinion regarding Plaintiff's need to change positions frequently matches the opinion by Social Security's own consultative examiner, Dr. Ralph Inabnit, who noted that Plaintiff "cannot stand or sit for prolonged periods of time." (Tr. at 483).

The fact that the ALJ did not even consider a sedentary RFC is evidenced by the fact the ALJ asked only one hypothetical question of the vocational expert at the hearing – would there be work for a hypothetical individual who could perform work "at the light exertional level except never climb ladders, ropes or scaffolds, can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl, have occasional exposure to unprotected heights, dangerous heavy moving machinery and wet, slippery surfaces." (Tr. at 98.) The ALJ never considered any of the limitations outlined by Dr. Ribaudo or even Dr. Inabnit – limitations that suggested far less than a light RFC. The ALJ never asked hypotheticals of the vocational expert for a claimant who would likely need a sit-stand option, as both Dr. Ribaudo and Dr. Inabnit opined Plaintiff would require.

Instead, the ALJ discounted the medical opinions. While it is true the Plaintiff did not have a long treatment history with Dr. Ribaudo, her complaints of debilitating pain were longstanding and Dr. Ribaudo's treatment of her complaints indicate that he believed her – in an era where doctors are scaling back narcotic prescriptions, Dr. Ribaudo prescribed the Plaintiff strong narcotics.

Clearly, the ALJ did not build any sort of bridge, much less a logical bridge, between the evidence and her conclusion that Plaintiff is not disabled. The ALJ's layman's read of the evidence is not a permitted basis on which to deny a claim for disability benefits. Thus, remand is required.

Lastly, Plaintiff argues that the Commissioner has not met the Agency's burden of proof at Step Five because the law requires a VE to cite jobs that exist in the region where the claimant lives or several specific regions of the country and the VE only cited the number of jobs in the nation. It is the Commissioner's burden at Step Five of the Sequential Evaluation Process to establish that a significant number of jobs exist in the national economy that the claimant can perform. *See Knight v. Chater*, 55 F.3d 309, 313 (7th Cir.1995). Plaintiff argues that the Commissioner failed to present evidence that a significant number of jobs exist in the national economy as defined in the statute, 42 U.S.C. § 423(d)(2)(A), and the regulations, 20 C.F.R. § 404.960 and 20 C.F.R. § 404.966. Plaintiff further argues that the ALJ also failed to follow the binding mandate of Social Security Ruling SSR 83-12.

The vocational expert testified that there were approximately 680,000 jobs in the national economy that Plaintiff could perform. (Tr. 98) The vocational expert testified she was not prepared to cite the number of jobs that existed in the region in which Plaintiff lived or in several regions of the country. (Tr. 106) The ALJ noted, "The claimant's representative objected to these job numbers on the ground that the vocational expert did not provide job numbers for the regional economy. The undersigned overrules this objection." (Tr. 23)

Plaintiff argues that when the vocational expert only offered an estimated number of jobs in the nation, she failed to meet the Commissioner's burden of proof at Step 5 of the Sequential

Evaluation Process. 42 U.S.C. § 423(d)(2)(A) defines "work that exists in the national economy":

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

That Step 5 vocational evidence must be stated in terms of either the region where the individual lives or in several regions of the country is emphasized in 20 C.F.R. § 416.960 (c)(1):

> If we find that your residual functional capacity does not enable you to do any of your past relevant work … We will look at your ability to adjust to other work by considering your residual functional capacity and the vocational factors of age, education, and work experience, as appropriate in your case. … Any other work (jobs) that you can adjust to must exist in significant numbers in the national economy (either in the region where you live or in several regions in the country).

Similarly, 20 C.F.R. § 416.966 explains that: "We consider that work exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country." The ALJ cited this regulation when overruling Plaintiff's objection. She said, "The vocational expert has professional knowledge and experience in job placement. Furthermore, Social Security regulations only require citation to work that exists in the national economy. (20 C.F.R § 416.966; HALLEX I-2-6-74)." (Tr. 23.)

Plaintiff contends that merely having professional knowledge and experience in job placement does not provide any foundation for estimating the number of jobs in the national or regional economy. In fact, the vocational expert testified she never had any education specific to estimating jobs. (Tr. 104-105.) Moreover, Plaintiff points out, the ALJ ignored the plain language

of 42 U.S.C. § 423(d)(2)(A): "work which exists in the national economy" means work which "exists in significant numbers either in the region where such individual lives or in several regions of the country." Social Security's internal policy manual, the Program Operations Manual System (POMS) states, "We only make a step five finding of not disabled, if we determine the claimant can adjust to a significant number of jobs in the national economy (whether in the region where the claimant lives or in several regions of the country.)" (POMS DI 25025.030 A).

It is an elemental principle of administrative law that agencies are bound to follow their own regulations. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). SSA cannot ignore its own regulations merely because it finds them difficult to apply. *See Rhodes v. Johnson*, 153 F.3d 785, 789 (7th Cir.1998) (noting that while an agency has discretion to reasonably interpret its regulations, this "must not be confused with the power to rewrite" unambiguous regulations); *Pearce v. Director, Office of Workers' Comp. Programs*, 647 F.2d 716, 726 (7th Cir.1981) (stating that "it is well settled that reasonable regulations promulgated pursuant to statutory authority have the force and effect of law.... [and] an agency is bound by its own regulations"). The Sixth Circuit, in a Social Security case, summarized the reason for this basic foundation of administrative law:

> The Supreme Court has long recognized that a federal agency is obliged to abide by the regulations it promulgates. *See Vitarelli v. Seaton*, 359 U.S. 535, 545, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *Service v. Dulles*, 354 U.S. 363, 372, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); An agency's failure to follow its own regulations "tends to cause unjust discrimination and deny adequate notice" and consequently may result in a violation of an individual's constitutional right to due process. Where a prescribed procedure is intended to protect the interests of a party before the agency, "even though generous beyond the requirements that bind such agency, that procedure must be scrupulously observed." *Vitarelli*, 359 U.S. at 547, 79 S.Ct.

968 (Frankfurter, J., concurring); *see also* Note, *Violations by Agencies of Their Own Regulations*, 87 Harv. L.Rev. 629, 630 (1974) (observing that agency violations of regulations promulgated to provide parties with procedural safeguards generally have been invalidated by courts).

*Wilson v. Commissioner of Social Security*, 378 F.3d 541, 545 (6th Cir. 2004).

Furthermore, there is a Social Security Ruling directly on point. "Social Security Rulings are agency rulings published under the authority of the Commissioner of Social Security and are binding on all components of the Administration." *Sullivan v. Zebley*, 493 U.S. 521, 531, n.9 (1990)(internal quotations omitted). This includes ALJ's . (*See Warmoth v. Bowen*, 798 F.2d 1109, 1111 n.5 (7th Cir. 1986)(per curiam).

SSR 83-12 makes clear:

Whenever vocational resources are used, and an individual is found to be not disabled, the determination or decision will include (1) citations of examples of occupation/jobs the person can do functionally and vocationally and (2) a statement of the incidence of such work in the region in which the individual resides or in several regions of the country.

Plaintiff concludes that, as the ALJ's decision does not contain a statement of the incidence of such work in the region in which the individual resides or in several regions of the country, it is both legally erroneous and cannot constitute substantial evidence supporting the ALJ's decision.

Seventh Circuit case law supports this point: "The test is whether (s)he is so disabled that there are no jobs in reasonable proximity to where (s)he lives that she is physically able to do." *Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004). *Barrett* is particularly instructive because the Commissioner did not like the Court's formulation of the test and asked for a rehearing. After rehearing the Court upheld their ruling noting, "We have found only a few cases

in which national numbers alone were cited as a basis for denying benefits." *Barrett v. Barnhart*, 368 F.3d 691, 692 (7th Cir. 2004).

In response, the Commissioner contends that providing national numbers "is consistent with the Commissioner's burden at step five." This is antithetical to a plain reading of the statute:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The requirement of testimony in terms of the region in which the claimant lives or several regions of the country is also laid out in the regulations and the rules. (*See* 20 C.F.R. §416.960(c)(1)("Any other work (jobs) that you can adjust to must exist in significant numbers in the national economy (either in the region where you live or several regions of the country"). *See also*, 20 C.F.R. §416.966(a), the Commissioner's definition of "Work that exists in the national economy": "We consider that work exists in the national economy when it exists in significant numbers either in the region where you live or several regions of the country." Similarly, the Commissioner acknowledges SSR 83-12, 45 Fed. Reg. 55,556 (August 20, 1980), but ignores that it mandates:

> Whenever vocational resources are used, and an individual is found to be not disabled, the determination or decision will include (1) citations of examples of occupation/jobs the person can do functionally and vocationally and (2) a statement of the incidence of such work in the region in which the individual

resides or in several regions of the country.

As noted above, Social Security Rulings are agency rulings published under the authority of the Commissioner of Social Security and are binding on all components of the Administration."

*Sullivan v. Zebley*, 493 U.S. 521, 531 n. 9, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990) internal quotations omitted). Clearly, the ALJ's decision directly violates this binding mandate:

> When an administrative agency promulgates rules to govern its proceedings, these rules must be scrupulously observed.... For once an agency exercises its discretion and creates the procedural rules under which it desires to have its actions judged, it denies itself the right to violate these rules. If an agency in its proceedings violates its rules and prejudice results, any action taken as a result of the proceedings cannot stand.

*Black v. Interstate Commerce Commission*, 737 F.2d 643, n.3 (7th Cir. 1984).

The Commissioner concedes that a "decision finding a claimant not disabled will include 'a statement of the incidence of such work in the region in which the individual resides or in several regions of the country.'" Yet, this was not included in the ALJ's decision. The Commissioner contends that "national numbers" could be interpreted to mean numbers of jobs from "several regions of the country." The Commissioner argues that "numbers for a claimant's region and numbers for several regions in the country are both part of the definition of the national economy." Clearly however, national numbers implies a total range of numbers across the entirety of the country, while job numbers from several regions implies job numbers that are more discrete and targeted for specific regional areas. This is not a case of statutory ambiguity – the plain language is clear. If the statute, the regulations, and the rulings mandated only national numbers, the statutory language would say so. The language of the statute, the regulations and the ruling is clear – the Commissioner cannot meet his burden of proof at Step Five of the Sequential

Evaluation Process unless vocational testimony is taken and the number of jobs are provided in terms of either the region in which the claimant lives OR several regions of the country.

As the ALJ failed to secure testimony that comported with the statute, the regulations, and the rules, remand is required to correct these errors.

Conclusion

On the basis of the foregoing, the decision of the ALJ is hereby REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.


 Entered: August 30, 2019.


s/ William C.  Lee
William C. Lee, Judge
United States District Court